**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Floyd Solomon MARSHALL, Sr., Defendant and Appellant.**

**Crim. No. 940268.**

Supreme Court of North Dakota.

May 9, 1995.

Constance L. Cleveland (argued), Asst. State's Atty., Fargo, for plaintiff and appellee.

Johnson Law Office, Fargo, for defendant and appellant; argued by Alisha Ankers.

MESCHKE, Justice.

Floyd Solomon Marshall appealed from his jury conviction of accomplice to burglary. We affirm.

Officer McDonald of the North Dakota State University Police Department was on patrol in Fargo in the early morning hours of November 7, 1993. He saw a car with its lights off in the G. Wilikers restaurant parking lot. McDonald drove by again, and saw Marshall in the car and Todd Edmond Cody near the restaurant's drive-up window. When they began to leave with their headlights off, McDonald stopped them, questioned them, and called other police for assistance.

The police discovered the restaurant's drive-up window ajar. They found pry bars, gloves, and cash within ten dollars of that stolen from the restaurant in Marshall's car. Police arrested Cody and Marshall for the burglary.

Marshall told police he had seen another nearby car that must have carried the actual burglars away. Marshall insisted that the cash in his car was from his vending machines at another place, and denied that Cody broke into the restaurant. Cody made no statement to the police.

Later, Cody pled guilty to burglary and agreed to testify against Marshall in return for a deferred sentence. Marshall was charged with violating NDCC 12.1–22–02 and

12.1–03–01 as an accomplice to burglary. Marshall pled innocent and went to trial.

At trial, Cody testified Marshall was instructing him how to burglarize businesses, and that they did the restaurant together. Since Marshall was too big to go in the window, Cody broke in, pried open a cash register, and took the money to split with Marshall. Officers testified that the car Marshall claimed he saw nearby turned out to belong to an elderly couple gone from Fargo since 1985. The vending machines that Marshall claimed the money came from were actually owned by a charitable organization, not him.

While Marshall testified he didn't make any statements to police and denied complicity in the burglary, the jury convicted him. The trial court sentenced Marshall to eight years in prison plus two years on probation. Marshall appeals.

Marshall contends that the jury selection process in North Dakota is unconstitutional, he was denied an impartial jury by a "racist" instruction, and the evidence was insufficient to convict him. He asserts "North Dakota's jury selection process is based upon a system whereby many individuals of minority races are excluded" and claims this system unconstitutionally denies him and other minorities an impartial jury venire. Marshall asserts a jury instruction to consider the "appearance" of witnesses told "the jury to make their decision based upon ... race" since "[t]he only minority in the courtroom during the trial was [Marshall], who is a very dark complected African–American." Finally, Marshall asserts the evidence was insufficient because he "was found guilty based upon the uncorroborated testimony of Todd Cody, who, for all practical purposes, was an accomplice in that he pled guilty to burglary, and in doing so, admitted that he was the individual to commit the crime." We are unconvinced.

I

■ Marshall argues North Dakota's jury selection process denies racial minorities fair representation in the jury pool. Therefore, Marshall claims he was "discriminated against since ... convicted [by] an all white jury."

■ A state would deny an accused member of a racial minority equal protection of the laws if it purposely excluded members of the accused's race from the jury for his criminal trial. *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879). "As long ago as *Strauder* ..., the Court recognized that by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror." *Batson v. Kentucky*, 476 U.S. 79, 87, 106 S.Ct. 1712, 1718, 90 L.Ed.2d 69 (1986). But there is no evidence of any purposeful exclusion in this case.

Jury selection in North Dakota is governed by NDCC Chapter 27–09.1, the Uniform Jury Selection and Service Act. It directs: "A citizen may not be excluded from jury service in this state on account of race, color, religion, sex, national origin, physical disability, or economic status." NDCC 27–09.1–02. In *State v. Manhattan*, 453 N.W.2d 758, 759 (N.D.1990), we rejected a similar unsupported claim that "the State 'deliberately denied Negroes as jurors,' " and we ruled this statute was neutral on its face.

■ More recently, this court again assessed the operation of the Uniform Jury Selection and Service Act and held "bare assertions, standing alone, are insufficient to show an underrepresentation of a distinct group." *State v. Fredericks*, 507 N.W.2d 61, 65 (N.D.1993). There, citing the tripartite test designed in *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979), we explained that, to show a facial violation of the Sixth Amendment right to a jury from a fair cross-section of the population,

the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Fredericks,* 507 N.W.2d at 65. The accused must make a facial showing before the burden shifts to the state to prove the selection process did not systematically discriminate against a distinctive racial group. *Id.*

Here, Marshall meets the first part of the test, but failed to meet the second and third parts. As in *Fredericks,* Marshall merely asserts percentages from recent census data to show that there were 280 blacks among 102,874 people in Cass County but, without any record support, claims there were "no blacks in the jury pool." From the census data, the potential representation of black people on his venire in relation to the population drawn from would have been very low, only one in 367. Marshall simply asserts that jury source lists other than voters and licensed drivers, like phone books, would have been more representative and increased the very slight chance of having a black person selected for this venire and jury. As in *Fredericks,* these "unsubstantiated assertions" are insufficient to show underrepresentation or systematic exclusion of a minority group from jury selection.

We conclude the current jury selection process is constitutionally administered.

## II

■ At the opening of the trial, the trial court instructed the jury about credibility of witnesses:

> In considering the weight and value of the testimony of any witness, you may take into consideration the *appearance,* attitude, and behavior of the witness, the interest of the witness in the outcome of the suit, the relation of the witness to the parties, the inclination of the witness to speak truthfully or not, the probability or improbability of the witness's statements, and all other facts and circumstances in evidence. Thus, you may give the testimony of any witness just such weight and value as you may believe the testimony of such witness is entitled to receive.

(Emphasis added). "Appearance" was also mentioned with "manner" in the court's final written instructions on "weight and credibility." Marshall argues the word "appearance" told the jury to take into account his race.

As a "very dark complected African–American," Marshall claims this denied him an impartial jury.

■ We review jury instructions as a whole, and determine whether they correctly and adequately inform the jury of the applicable law. *State v. Azure,* 525 N.W.2d 654, 658 (N.D.1994). If, as a whole, an instruction is erroneous, relates to a central subject in the case, and affects a substantial right of the accused, we will reverse for that error. *Id.* However, Marshall did not object to these jury instructions, and makes this objection for the first time on appeal.

■ Our review of the propriety of these instructions thus depends on whether there was obvious error affecting a substantial right of Marshall. *See State v. McKinney,* 518 N.W.2d 696, 701–02 (N.D.1994) (standard of review for claims of racially prejudicial remarks of the prosecutor not objected to by defense counsel). "[S]tatements [of counsel] calculated to inflame the racial, religious, or ethnic prejudices of jurors introduce into the trial elements of irrelevance and irrationality that cannot be tolerated in a society based upon the equality of all citizens before the law." *Id.* at 702. Similarly, a judicial instruction that would invoke racial prejudices among jurors would be intolerable.

In a different context, it is conceivable the word "appearance" might imply a racial aspect. In this case, however, we conclude the instruction on "appearance" was not intended to mark a racial characteristic, but rather was a customary one intended to suggest attention to those outward mannerisms of a witness that might reasonably affect credibility.

While the ordinary meaning of "appearance" is the "outward aspect" of something, The New Merriam–Webster Dictionary 51 (1989), it is not customarily meant to connote that the color of a person's skin affects credibility. Rather, "appearance" in this context refers to a person's entire semblance for assessing credibility rather than to a particular physical feature. "In determining the credibility of a witness, it is proper for the court to consider his appearance, conduct on

the stand, demeanor, manner of testifying, such as candor or frankness or evasiveness of his story." *Wellens v. Beck,* 103 N.W.2d 281, 285 (N.D.1960). That describes how judges and juries study witnesses for credibility purposes. Here, any inadvertent implication that the color of a witness's skin matters would have been easily dispelled upon timely objection by counsel and prompt clarification by the court about what was intended.

As a whole, the statement that Marshall deems offensive correctly instructed the jury about all witnesses' candor and credibility, not just Marshall's. No racial suggestion was implicit in this context. The instruction was not erroneous, did not affect a central element of the case, and did not harm Marshall's substantial rights.

We conclude there was no improper jury instruction that requires reversal.

## III

 Marshall argues that the evidence was insufficient to convict him because it was based solely upon testimony of an uncorroborated accomplice. We disagree.

 Our review of a claim of insufficiency of evidence is limited:

We will not reverse a criminal conviction unless, after viewing all reasonable inferences favorable to the prosecution, no rational fact finder could have found the defendant guilty beyond a reasonable doubt. *Id.* As *State v. Syring,* 524 N.W.2d 97, 98 (N.D.1994), explained, the "defendant must show that the evidence, when viewed in a light most favorable to the verdict, establishes no reasonable inference of guilt."

*State v. Torres,* 529 N.W.2d 853, 855 (N.D. 1995). Corroboration is required for testimony of an accomplice:

A conviction cannot be had upon the testimony of an accomplice unless he is corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof.

NDCC 29–21–14. Evidence to corroborate an accomplice's testimony need not be incriminating in itself, or sufficient, standing alone, for a conviction. *Torres,* 529 N.W.2d at 855, citing *State v. Burgard,* 458 N.W.2d 274 (N.D.1990). *Torres* explains those requirements are met when some material fact tending to connect the accused with the crime is corroborated.

Officer McDonald testified that he saw Marshall sitting in a parked car with the headlights off at the restaurant, Cody standing by the drive-up window there, and no other car nearby. Fargo police officers testified that they found "a wad of one dollar bills, some loose change, a couple of pry bars and some gloves" in Marshall's car. Paint on one pry bar matched the broken window on the restaurant. The owner of the restaurant testified that a money clip found in Marshall's car was identical to a clip he kept in the cash register.

Marshall drove and owned the car. He was caught at the scene of the burglary in incriminating circumstances and with the testifying accomplice. *See Torres.* Marshall himself testified he was at the scene with Cody, knew Cody left his car to burglarize the restaurant, and "when I went back to get him," he was arrested. His testimony also differed from what he told the officer at his arrest. In all, there was a great deal of evidence to corroborate Cody's direct testimony that Marshall was teaching him burglary skills and helped him burglarize the restaurant.

The aggregate evidence fully supports Marshall's conviction for the crime of accomplice to burglary. We affirm.

VANDE WALLE, C.J., and LEVINE, NEUMANN and SANDSTROM, JJ., concur.