1997 ND 60

**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Barry Caesar GARCIA, Defendant and Appellant.**

Criminal No. 960180.

Supreme Court of North Dakota.

April 1, 1997.

John T. Goff (argued), Cass County State's Attorney, Fargo, for plaintiff and appellee.

Warren A. Kochis (argued), Apple Valley, and Richard Henderson (appearance), of Nilles, Hansen & Davies, Ltd., Fargo, for defendant and appellant.

MESCHKE, Justice.

[¶ 1] Barry Caesar Garcia appeals a jury verdict and a criminal judgment finding him guilty of murder and aggravated assault, and sentencing him to life imprisonment without parole. We affirm.

[¶ 2] In a residential neighborhood in West Fargo on November 15, 1995, near 10:30 p.m., a short, young man walked up to the front passenger door of a car where Pat and Cherryl Tendeland were in the front seat, and Connie Guler, their friend, was in the backseat. From close to nine inches, the young man fired a sawed-off shotgun through the front passenger window, wounding Pat and killing Cherryl.

[¶ 3] Police later arrested Garcia with three other young men. The State charged Garcia, then age 16, with murder, attempted robbery, aggravated assault, and a street-gang crime in juvenile court. Garcia was transferred to adult court for trial.

[¶ 4] During the trial, after the State's case-in-chief, the trial court granted both the State's motion to dismiss the street-gang charge and Garcia's motion for acquittal of the attempted robbery charge. The jury found Garcia guilty of murder, a class AA felony, and aggravated assault, a class C felony. The trial court sentenced Garcia to life imprisonment without parole on the murder conviction, and to a concurrent five years imprisonment on the aggravated assault conviction. Garcia appealed.

I

[¶ 5] During the evening of November 15, 1995, juveniles Jaime Guerrero, Juan Guerrero, Michael Charbonneau, Ray Martinez, Angel Esparza, and Garcia drove around Fargo–Moorhead in a brown, 1975, Minnesota-licensed, Ford sedan owned by Juan Guerrero's mother. The young men took along 10 to 15 red and green shotgun shells and a sawed-off shotgun owned by the Skyline Piru Bloods, a street gang whose members included Jaime Guerrero, Juan Guerrero and Martinez. While driving in a West Fargo residential area near 10 p.m., Garcia asked the driver to stop. Garcia and Charbonneau, who is much taller than Garcia, left the car. Garcia took the shotgun. Their car continued down the street and came to a stop, and Garcia and Charbonneau began walking around the neighborhood.

[¶ 6] In the same neighborhood, Pat and Cherryl Tendeland were dropping off their friend, Connie Guler, who had accompanied them to a prayer service in Hillsboro. In the Tendeland car parked in Guler's driveway, while seated and talking, Guler saw a "taller boy ... maybe six feet or taller" and a "shorter one ... five feet or less tall" walking down the sidewalk toward them. Guler thought the shorter boy was carrying a gun, but Pat thought it was an umbrella. After the boys stood near Guler's driveway for awhile, they began walking back toward the brown Ford sedan. From their suspicious behavior, Pat decided to back up and follow the boys " 'to see where they [were] going.' "

[¶ 7] As the Tendeland car slowly approached the Ford sedan, Guler saw the taller boy walking briskly toward the Ford and the shorter boy with the gun lagging behind. The Ford's lights were on, and it started to pull away. Cherryl read off the car's license number. Guler testified about the next thing she remembered:

I caught out of the sight of my eye something, and I turned, and this shorter boy was coming down off my berm, and he was so close, he could have opened my car door.

And the next—our eyes met, and all I remember was these cold, dark eyes. And that's all I know. I don't have a face. And it just—he just raised it.

I said, "My God, he's going to shoot," and it went off. I mean, it wasn't a matter of—it was just (indicating), like a click of the finger. It was so quick. And all I thought of then was Pat, you know, that he was the one that had gotten hurt.

And I didn't even think about Cherryl, because I thought she was going to bounce back up. I did duck.

Cherryl was shot in the forehead and shotgun pellets also struck Pat's face, knocking a lens from his glasses. Guler was not struck by the blast. Pat, who had difficulty seeing with blood running down his face and without the lost lens, decided to drive to a nearby police station.

[¶ 8] Jaime Guerrero, who had remained in the Ford, testified he did not see the gunshot, but he heard it. Guerrero said Charbonneau and Garcia got back in the car about 20 seconds after he heard the shotgun blast. According to Guerrero, Garcia, who was still carrying the shotgun, said "they got her," and "'next time, don't look at me.'" The boys left the area but continued driving around, eventually returning Esparza and Charbonneau to their homes. They also stopped at a Subway sandwich store, where Garcia purchased a sandwich and argued with the clerk for having to pay more for extra meat.

[¶ 9] Guler, who is a nurse, tended to Cherryl's wounds while Pat drove toward the police station. Realizing Cherryl's wounds were much worse than she had first thought, Guler told Pat to stop at a convenience store and phone 911 for emergency assistance. Police and an ambulance crew arrived soon, and took Tendelands to a hospital. Cherryl was pronounced dead at the emergency room.

[¶ 10] Police got descriptions of the brown Ford sedan in the area of the shooting and its Minnesota license plate number, and then surveilled the owner's residence in south Moorhead. Near 11:45 p.m., a squad car spotted the Ford, began following it, and called for help. Seven or eight squad cars assisted. Police pulled behind the Ford as it turned into the car owner's driveway.

[¶ 11] Garcia was the only occupant who refused police orders to either remain in the car or lie on the ground and, instead, fled on foot. Police recovered a sawed-off shotgun with a warm barrel from the backseat of the car along with several red and green shotgun shells. Shortly, the police chasing after Garcia captured him in an athletic field at Moorhead State University. When arrested, Garcia possessed one green and three red shotgun shells.

[¶ 12] A spent shotgun shell recovered at the scene of the shooting had contained size triple B steel shot that was the same size as shot recovered from Pat's wound and the Tendeland car. Shot recovered from Cherryl's body was No. 3 size shot and consistent with the shot recovered from the Tendeland car. The spent shotgun shell recovered at the scene had been fired from the sawed-off shotgun found in the brown Ford sedan.

[¶ 13] Neither Pat nor Guler could positively identify Garcia as the person who shot into the Tendeland car. No usable fingerprints were found on the shotgun. Atomic absorption tests on Garcia, Martinez, and Jaime and Juan Guerrero showed significant levels of antimony and barium on all four individuals, thus evidencing each of them could have recently fired a gun or handled a gun that had been recently fired. The pattern on the sole of Garcia's tennis shoes corresponded with shoeprints found at the scene of the shooting.

## II

[¶ 14] The Tendeland shooting brought on much publicity, and the trial court allowed expanded media coverage of Garcia's jury trial. *See* NDAdminR 21. At the trial, the State called Jaime Guerrero as a witness. When asked his name, Guerrero replied, "I am not going to say nothing."

[¶ 15] Away from the jury, the trial court learned Guerrero had not been granted immunity to testify, warned Guerrero he may be subject to contempt penalties, and also informed him of his Fifth Amendment rights to remain silent and to speak to a lawyer. Guerrero asked to speak with a lawyer, and the trial court appointed the same lawyer who was representing Guerrero in juvenile court to advise him. The court recessed, and Guerrero consulted his lawyer during the lunch hour.

[¶ 16] When the trial court reconvened out of the presence of the jury, Guerrero was still consulting with his lawyer. The State's attorney explained to the court:

Mr. Guerrero has indicated some willingness to proceed and provide testimony to

matters which he has already provided us information.

I'm concerned—and it's been relayed to me—that there may be some concern about the media coverage, particularly the television camera, and also the number of viewers and spectators in the audience of the courtroom.

It is—it's my request at this time that, for the testimony of Jaime Guerrero, that the Court terminate expanded media coverage, terminate the use of the television camera, terminate the feed to the television and/or radio just for that testimony, and that the Court also order that anybody other than the family of Barry Garcia or the family of Cherryl Tendeland be excused from the courtroom, to present—to present a more friendly environment, if you will, for the testimony of this child, who is only 15 years of age.

I think there are good arguments to be made for the termination of the expanded coverage for a person only 15 years of age. There is some reason to believe that he is concerned about other persons' opinions and feelings and actions if he decides to go ahead and testify.

For those reasons, we would like to ask that the media coverage be terminated for Mr. Guerrero and the courtroom be essentially cleared, except for family.

Garcia's attorney resisted the State's request, arguing there was "no compelling reason to shut things down at this point." The court recessed again until Guerrero completed consultation with his lawyer.

[¶ 17] The trial court reconvened away from the jury with Garcia and his lawyer, Guerrero's lawyer, and the State's attorney. The State's attorney explained he had promised to dismiss with prejudice the juvenile court charges against Guerrero if he testified truthfully in Garcia's trial. Guerrero's lawyer told the court Guerrero "is a juvenile, and he is intimidated by the audience and media coverage," and elaborated on Guerrero's reluctance to testify:

I think he's intimidated by the whole spectacle of the trial, that he will be on television, he will be in the newspaper again.

And it would put him at ease not to have to experience this.

And he is a juvenile and does want his confidentiality preserved, if possible, but I guess that's not—it's not really possible. But those are some of the factors that make him not want to testify. This would put him at ease if he didn't have to kind of run the gauntlet to make—before even his testimony.

Garcia's lawyer again objected to any closure of the trial. The State's attorney explained:

I would like, just for the record, to note that in support of our request and our position, we are aware of another witness, not Mr. Guerrero, but another witness who has indicated a reluctance to provide testimony, who has been subpoenaed, because of actual repercussions that he's already experienced.

So we are basing these requests on some real events, not just speculation. At least that's what I have been told. I have no personal knowledge of it.

The court outlined its "initial thoughts," but recessed and deferred ruling until the media had an opportunity to be heard.

[¶ 18] After hearing argument from a media representative, the trial court ruled:

It is the opinion of the Court that in this particular case that it is in the interests of justice to suspend the expanded media coverage order for this witness, and to suspend the rule as regards media coverage. Exercising the inherent powers of the Court to control the courtroom, I am going to order that the courtroom be cleared, that the feeds to the radio and the television be terminated, and that all persons, except for counsel, Mr. Garcia, and Detective Warren, and the immediate family of—was it—of Mr. Garcia, and the immediate family of Mrs. Tendeland.

When I say "the immediate family" of Mrs. Tendeland, I mean Pat Tendeland and the two sons. And that's it. And when I say the immediate family of Mr. Garcia, I mean Mr. Garcia's grandmother and Mr. Garcia's brother is present. And I think that's it.

\* \* \* \* \*

The cautionary instruction I intend to give . . . will read as follows: Ladies and gentlemen of the jury, as you are aware, Mr. Guerrero has indicated an unwillingness to testify. He has expressed a concern about all the media coverage, all of the people—and all the people in the courtroom.

Taking into consideration the youth of Mr. Guerrero and his concerns, the Court has determined that in order to facilitate his testimony, the courtroom will be cleared of all persons. You are not to draw any conclusions or inferences from the clearance of the courtroom.

The court also allowed a single pool representative, chosen by the media, to remain in the courtroom. The court gave the jury the cautionary instruction, and Guerrero testified in the partially closed courtroom.

[¶ 19] Garcia claims his constitutional rights to a public trial were violated when the trial court temporarily terminated expanded media coverage and excluded the general public from the courtroom for Guerrero's testimony.

[¶ 20] The Sixth Amendment to the United States Constitution guarantees a criminal defendant "the right to a speedy and public trial. . . ." *See also* N.D. Const. Art. I, § 12. Although the guarantee of a public trial was created for the benefit of criminal defendants, *see In re Oliver*, 333 U.S. 257, 270 n. 25, 68 S.Ct. 499, 506, n. 25, 92 L.Ed. 682 (1948), the right is also shared with the public; the common concern is to assure fairness. *Press–Enterprise Co. v. Superior Court of Cal.*, 478 U.S. 1, 7, 106 S.Ct. 2735, 2739, 92 L.Ed.2d 1 (1986). "In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury." *Waller v. Georgia*, 467 U.S. 39, 46, 104 S.Ct. 2210, 2215, 81 L.Ed.2d 31 (1984). The Supreme Court explained in *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383, 99 S.Ct. 2898, 2907, 61 L.Ed.2d 608 (1979): "Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously, and generally give the public an opportunity

to observe the judicial system." Precedents demonstrate, however, that the right to a public trial is not absolute and must give way in rare instances to other interests essential to the fair administration of justice.

[¶ 21] The contours of a criminal defendant's right to a public trial in the context of total closure of an entire pretrial suppression hearing were confronted by the Supreme Court in *Waller*. The *Waller* Court, 467 U.S. at 48, 104 S.Ct. at 2216, ruled that defendant's public-trial guarantee had been violated, and explained:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

The *Waller* Court made clear that a trial court's power to exclude the public from a criminal trial should be exercised sparingly and then only for the most unusual of circumstances.

[¶ 22] We used the *Waller* standard to measure a trial court's temporary closure of a defendant's criminal trial on charges of gross sexual imposition during the testimony of the child victim, the defendant's adopted son. *State v. Klem*, 438 N.W.2d 798 (N.D. 1989). Klem's first trial had been entirely open to the public while the child victim testified, and had resulted in a hung jury. At the second trial, when the child witness was first seated to testify, the State's attorney abruptly requested closure of the trial for the child's testimony because the " 'sensitive nature' " of the case " 'may be very distracting and very embarrassing for him in front of all these people and the people in the Courtroom may inhibit the testimony.' " *Klem*, 438 N.W.2d at 799. After the defendant objected to the proposed closure, the court summarily ruled, " 'I think I will clear the Courtroom,' " and did so. *Id.*

[¶ 23] A majority of this Court concluded the trial court, in closing the trial to all but court personnel, parties, attorneys, jurors, and a public media representative during the

child's testimony, deprived the accused of his right to a public trial. We reversed and remanded for a new trial.

[¶ 24] Because the bare assertions by the State's attorney were insufficient to justify closure, the majority concluded the trial court had failed to satisfactorily comply with the *Waller* requirements:

> There was no hearing, no weighing of competing interests, and no findings to support closure. While the trial court's allowance of the presence of a media representative may have satisfied the public's first amendment right, it did not address the defendant's sixth amendment right to a public trial.

*Klem*, 438 N.W.2d at 801. Garcia argues the trial court in this case, like the trial court in *Klem*, largely ignored the *Waller* requirements in ordering the partial closure of the courtroom, so that a reversal and a remand for a new trial are necessary. We disagree.

[¶ 25] This case differs from *Klem* in several major ways. We pointed out in *Klem* that, ordinarily, a motion to close a trial to the public should be made before trial to avoid unfair surprise and to give the trial court the benefit of research and arguments, but the reasons for closure could not have been reasonably anticipated in this case. The mid-trial motion in *Klem* could have been made before trial, and the reasons for it were given in generalities as the child witness was seated to testify. The witness had in fact testified publicly in the first trial, so there was no apparent reason for either the closure motion or the order.

[¶ 26] Here, Guerrero had given a sworn statement in exchange for the State's promise not to attempt to transfer his case from juvenile to adult court. Not until Guerrero was called as a witness for the State, refused to respond to any questions, and consulted with his attorney was the State's attorney or anyone else expecting Guerrero to decline to testify.

■ [¶ 27] This trial court's actions show the careful consideration and weighing of competing interests so sorely lacking in *Klem*. In contrast to the summary ruling in *Klem*, this trial court held an in-chambers hearing, two open court hearings out of the jury's presence, and delayed ruling until the media could also be heard on the request for closure. Although this trial court did not hold a formal evidentiary hearing on the motion, an evidentiary hearing is not necessarily required unless requested. *See United States v. Sherlock*, 962 F.2d 1349, 1359 (9th Cir.1989), *cert. denied sub nom., Charley v. United States*, 506 U.S. 958, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992); *United States v. Raffoul*, 826 F.2d 218, 225 (3d Cir.1987); *Fayerweather v. Moran*, 749 F.Supp. 43, 44 (D.Ct.R.I.1990). Garcia did not request an evidentiary hearing.

■ [¶ 28] The *Klem* trial court's exclusion of the general public, except for one media representative, more closely resembled a complete or total closure of the courtroom than what the trial court did here. This court allowed the Tendeland and Garcia family members to remain in the courtroom. This was only a partial closure, one that generally "results in the exclusion of certain members of the public while other members of the public are permitted to remain in the courtroom." *State v. Sams*, 802 S.W.2d 635, 639–640 (Tenn.Ct.Crim.App.1990) (footnote omitted). When a trial court orders a partial, rather than a total, closure of a court proceeding at the request of a party, a "substantial reason," less stringent than the *Waller* "overriding interest" requirement, can justify the closure. *See, e.g., United States v. Osborne*, 68 F.3d 94, 98 (5th Cir.1995); *Woods v. Kuhlmann*, 977 F.2d 74, 76 (2nd Cir.1992); *Sherlock*, 962 F.2d at 1357; *Nieto v. Sullivan*, 879 F.2d 743, 753 (10th Cir.), *cert. denied*, 493 U.S. 957, 110 S.Ct. 373, 107 L.Ed.2d 359 (1989); *Douglas v. Wainwright*, 739 F.2d 531, 533 (11th Cir.1984), *cert. denied*, 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985); *Sams*, 802 S.W.2d at 640. We believe this trial court had a substantial reason to partially and temporarily close Garcia's trial during Guerrero's testimony.

[¶ 29] This trial court was aware of the widespread publicity generated by this case and the effect of the television camera in the courtroom. Allegations of street-gang activity dramatized this case. The State's attor-

ney told the court about possible "repercussions" experienced by another subpoenaed witness. Guerrero's attorney explained his juvenile client's understandable intimidation from being seen testifying on television and publicized in newspapers that brought about his reluctance to testify. We would have much preferred the trial court to have gotten the explanation for Guerrero's reluctance to testify from Guerrero himself rather than filtered through the State's attorney and Guerrero's lawyer. *See Commonwealth v. Penn*, 386 Pa.Super. 133, 562 A.2d 833, 838–839 (1989), *cert. denied* 502 U.S. 816, 112 S.Ct. 69, 116 L.Ed.2d 43 (1991). But extensive interviews with the reluctant witness, while no doubt the better practice, are not constitutionally compelled. *See Kuhlmann*, 977 F.2d at 77; *State v. Cockshutt*, 59 Ohio App.3d 87, 571 N.E.2d 464 (1989), *overruled on other grounds by State v. Campbell*, 74 Ohio App.3d 352, 598 N.E.2d 1244, 1248 n. 1 (1991); *State v. Rusin*, 153 Vt. 36, 568 A.2d 403, 405 (1989). Here, Guerrero's lawyer consulted with him at length before submitting his client's concerns to the court. The representations to the court by the State's attorney and by Guerrero's lawyer differ substantially from the bare and general assertions of the prosecuting attorney condemned in *Klem*. Here, Guerrero's intimidation and hesitation to testify were amply demonstrated to the trial court by his opening refusal to even give his name.

[¶ 30] A trial court can properly weigh an accused's right to a public trial against the interests of protecting a witness from intimidation to enable the witness to testify with more composure. *See People v. Angel*, 790 P.2d 844, 846 (Colo.Ct.App.1989). A trial court may exclude members of the public from a trial if a witness will be inhibited or embarrassed to testify in the presence of an audience from his tender age or the nature of his testimony, from actual threats, or from the possibility of reprisals by others if the witness testifies. *See* 3 J. Cook, *Constitutional Rights of the Accused* § 18:1 (3d ed. 1996); 3 D. Rudstein, C. Erlinder, D. Thomas, *Criminal Constitutional Law* ¶ 14A.01[2][e] (1996); Annot., *Exclusion of public from state criminal trial in order to avoid intimidation of witness*, 55 A.L.R.4th

1196 (1987), and cases collected therein. In this case, allegations of gang-related activities and possible "repercussions" like those experienced by another potential witness added to the weighing process. Guerrero, who was only 15 and obviously aware of the television camera and other spectators in the courtroom, was hesitant to testify at all. The trial court tailored its order to protect Guerrero and to facilitate his testimony. We conclude a substantial reason existed for the trial court to order partial and temporary closure of Garcia's trial for Guerrero's testimony.

[¶ 31] We disagree with Garcia that the trial court's partial closure order went further than necessary. Here, the trial court allowed a representative chosen by the media to remain at the trial, as well as the immediate family members of Tendeland and Garcia. The courts encourage allowing an accused's family members to remain in the courtroom during a partial closure. *See, e.g., Sherlock*, 962 F.2d at 1357; *Ip v. Henderson*, 710 F.Supp. 915, 919 (S.D.N.Y.), *aff'd* 888 F.2d 1376 (2nd Cir.1989); *People v. Kan*, 78 N.Y.2d 54, 571 N.Y.S.2d 436, 574 N.E.2d 1042, 1045 (1991). Garcia did not ask the court to allow other relatives or friends to remain in the courtroom during Guerrero's testimony, although he could have. If Garcia wanted others to remain, he should have pointed them out to the trial court and asked they be allowed to stay. *See People v. Benson*, 251 Ill.App.3d 144, 190 Ill.Dec. 528, 621 N.E.2d 981, 985 (1993). The trial court's order for partial closure lasted only during Guerrero's testimony, and then those excluded were readmitted. Although Garcia urges the courtroom should have been left entirely open, we conclude this partial closure was no more than necessary to protect Guerrero and to encourage his testimony.

[¶ 32] A trial court must also consider reasonable alternatives to a partial closure. We recognize that "[c]losure of the courtroom to the public is not the only, nor necessarily the most effective, response to [witness] intimidation." *Penn*, 562 A.2d at 839. We also recognize, however, that other alternatives sometimes provoke serious confrontation problems. *See, e.g., Annot., Permissibility*

*of testimony by telephone in state trial,* 85
A.L.R.4th 476, § 3 (1991); Annot., *Closed-circuit television witness examination,* 61
A.L.R.4th 1156, § 4 (1988); Annot., *Conditions interfering with accused's view of witness as violation of right of confrontation,*
19 A.L.R.4th 1286 (1983). This record is
shallow on consideration of reasonable alternatives. The State's attorney, however,
identified confrontation problems in possible
alternatives in stating:

> [W]e're not asking that Mr. Garcia in any
> way be deprived of any of his rights of
> confrontation, cross-examination, so forth.
> We're merely here to try and search for
> the truth through all the evidence that's
> available to us. I think it's—reasonable
> accommodations should be made in that
> regard.

[¶ 33] The trial court considered variations
for the partial closure order, at one point
telling the attorneys:

> What I am inclined to do is try and minimize the disruption as much as possible
> by—let me tell you what my initial
> thoughts are.
>
> My initial thoughts were—was to clear the
> courtroom of everyone except the immediate family of the Garcias. And my initial
> thought was to order the media not to
> publish in any fashion any of the testimony
> that's offered, but not necessarily exclude
> them from the courtroom. We cut the
> feed to the camera, you got the radio—cut
> the lead to the radio.
>
> The amount of disruption then is just very
> minimal. Then, you know, as far as the
> jury is concerned, the only people that
> would be missing would be all the spectators.

Although this case poses a difficult question,
we conclude the court properly considered
reasonable alternatives, and found the partial
closure to be the only adequate solution for
the problem confronting the court. While it
would have been helpful if the trial court had
made more explicit findings about possible
alternatives, *see Sherlock,* 962 F.2d at 1359,
we see no constitutional error here.

[¶ 34] Garcia asserts the trial
court's findings are inadequate for the partial
closure order. But "there is no prescribed

format to which a trial judge must adhere in
fulfilling the mandate that adequate findings
be made to support a closure order." *Fayerweather,* 749 F.Supp. at 46. A trial court is
"not required to belabor the obvious by exhaustively reciting every observation and inference underlying [its] findings." *Id.* The
trial court need only articulate findings in
terms specific enough for a reviewing court
to determine the basis for the order. *Klem,*
438 N.W.2d at 801. The trial court did so in
this case.

[¶ 35] The trial court expressly considered
Guerrero's obvious unwillingness to testify
that was exhibited to the jury, and weighed
Guerrero's youth and his intimidation by the
presence of the media and the other spectators in the courtroom. In light of these
findings and the information gleaned from
the conferences between the judge, the
State's attorney, Guerrero's lawyer, and Garcia and his lawyer, we conclude the trial
court's findings are constitutionally adequate.

[¶ 36] We stress again that trial
courts should not lightly close a criminal trial
in any manner, and when dealing with a
request for closure, a court must take pains
to develop a complete record and make detailed findings about all the circumstances.
More explicit findings would have facilitated
review in this case. But, considering the
circumstances with the findings the trial
court did make, we conclude Garcia's constitutional rights to a public trial were not
violated by the brief, narrowly tailored, and
partial closure ordered for Guerrero's testimony.

### III

[¶ 37] Garcia claims his conviction
must be reversed because Guerrero's testimony was uncorroborated. We disagree.

[¶ 38] Corroboration is required
for a conviction on the testimony of an accomplice:

> A conviction cannot be had upon the testimony of an accomplice unless he is corroborated by such other evidence as tends to
> connect the defendant with the commission
> of the offense, and the corroboration is not

sufficient if it merely shows the commission of the offense, or the circumstances thereof.

NDCC 29–21–14. Corroboration is needed to demonstrate the reliability of the accomplice as a witness. *State v. Zimmerman,* 524 N.W.2d 111, 114 (N.D.1994). Evidence to corroborate an accomplice's testimony need not be incriminating in itself, or sufficient, standing alone, for a conviction. *State v. Torres,* 529 N.W.2d 853, 855 (N.D.1995). As we explained in *State v. Marshall,* 531 N.W.2d 284, 288 (N.D.1995), the corroboration requirement is met when some other material facts tend to connect the accused with the crime.

[¶ 39] Guerrero identified Garcia as the person who left from and returned to the Ford with the sawed-off shotgun. Pat Tendeland and Connie Guler gave physical descriptions of the boys who approached the Tendeland car in the Guler driveway and in the street immediately before the murder. Those descriptions matched Garcia and Charbonneau. They testified the shorter boy was carrying the shotgun. Law enforcement officers gave physical descriptions of Charbonneau who is significantly taller than Garcia. Results of atomic absorption tests on Garcia reported he had handled a recently discharged firearm. Shoeprints found at the crime scene corresponded with the pattern of the sole of Garcia's tennis shoes. Garcia was the only person who attempted to flee from the police. When arrested, Garcia possessed a shotgun shell of the same make, color, gauge, and shot size that killed Cherryl.

[¶ 40] These circumstances connected Garcia with the murder and clearly corroborated Guerrero's testimony.

## IV

[¶ 41] Garcia claims he was denied his due process right to a fair trial because the State charged him with a street-gang crime knowing it did not have sufficient evidence for the charge. Garcia claims the State knew from Guerrero's sworn statement, basically the same as his trial testimony, that, although other boys in the Ford were street gang members, it was "unequivocally established" Garcia was not. Since the State nevertheless charged Garcia with a street-gang crime, and then moved to dismiss the charge after its case-in-chief, Garcia argues the State's only purpose was to inject the specter of street gangs into the jurors' minds, therefore denying him a fair trial. We reject Garcia's argument.

[¶ 42] The street-gang crime is defined in NDCC 12.1–06.2–02:

Any person who commits a felony or class A misdemeanor crime of violence or crime of pecuniary gain for the benefit of, at the direction of, or in association with any criminal street gang, with the intent to promote, further, or assist in the affairs of a criminal gang, or obtain membership into a criminal gang, is guilty of a class C felony.

Contrary to the implication of Garcia's argument, the plain terms of the statute do not require actual "membership" in a street gang for a criminal violation. A criminal violation of the statute can occur in a variety of ways without the alleged violator being an actual member of a street gang. Indisputably, Garcia accompanied street gang members. Garcia even waived his right to a preliminary hearing on the street-gang crime charge.

[¶ 43] The State's attorney explained he had made a tactical decision to rest the case and voluntarily dismiss the street-gang crime charge without offering more evidence on it because he believed they had made a "very strong murder case" against Garcia, and "did not want to risk a murder conviction by the potential appellate issues raised by the necessary evidence to obtain a conviction" of the street-gang crime.

[¶ 44] A State's attorney has broad discretion in the charging process, *see Richmond v. Haney,* 480 N.W.2d 751, 759 (N.D. 1992); *Hennebry v. Hoy,* 343 N.W.2d 87, 90–91 (N.D.1983), but a State's attorney must refrain from prosecuting a charge "the prosecutor knows is not supported by probable cause." NDRPC 3.8(a). *See also Commonwealth v. Bray,* 19 Mass.App. 751, 477 N.E.2d 596, 604 (1985); *Commonwealth v. Berryman,* 437 Pa.Super. 258, 649 A.2d 961, 974 (1994). On this record, we decline to accept Garcia's bald assertion that the street-

gang charge was a bad faith contrivance by the State's attorney.

[¶ 45] We conclude the State did not deny Garcia a fair trial by charging him with a street-gang crime and moving to have that charge dismissed at the end of the State's case-in-chief.

V

[¶ 46] Garcia claims his sentence of life imprisonment without parole constitutes cruel and unusual punishment within the meaning of the Eighth Amendment. We reject Garcia's argument.

[¶ 47] The Eighth Amendment prohibition against cruel and unusual punishment applies to non-capital punishment cases. *See Solem v. Helm*, 463 U.S. 277, 288–289, 103 S.Ct. 3001, 3009, 77 L.Ed.2d 637 (1983). However, the United States Supreme Court in *Stanford v. Kentucky*, 492 U.S. 361, 380, 109 S.Ct. 2969, 2980, 106 L.Ed.2d 306 (1989), ruled the Eighth Amendment does not prohibit states from imposing even capital punishment on offenders who commit murder at the age of 16. *Solem*, 463 U.S. at 292, 103 S.Ct. at 3011, holds the legislatively established maximum punishment for a crime, with "substantial deference" given to the "broad authority of the legislature," must meet a proportionality test: "[A] court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions."

[¶ 48] Here, Garcia does not assert the maximum punishment of a life sentence without the possibility of parole is disproportional to the crime of class AA felony murder. *Compare People v. Launsburry*, 217 Mich. App. 358, 551 N.W.2d 460, 463–464 (1996) (life sentence without possibility of parole for 16–year–old defendant was not cruel or unusual punishment). Nor does Garcia assert, assuming for purposes of argument that *Solem* remains good law, *see Harmelin v. Michigan*, 501 U.S. 957, 994–996, 111 S.Ct. 2680, 2701–2702, 115 L.Ed.2d 836 (1991), that his sentence fails the proportionality requirement. Rather, Garcia argues the Eighth Amendment is violated here because, in authorizing the maximum penalty of life imprisonment without parole for class AA felonies, *see* NDCC 12.1–32–01(1), the legislature "failed to provide any guidelines or criteria to guide a judge in determining whether the most severe penalty should be imposed."

[¶ 49] Garcia seeks to inject all capital punishment standards into non-capital crimes. He relies on two capital punishment cases for his argument. In *McCleskey v. Kemp*, 481 U.S. 279, 303, 107 S.Ct. 1756, 1773, 95 L.Ed.2d 262 (1987), the Supreme Court said, to impose the death penalty, a state must narrow the class of murderers subject to capital punishment by giving specific and detailed guidance for the sentence. The *McCleskey* Court held the discretion allowed decisionmakers in the Georgia capital sentencing scheme did not violate the Eighth Amendment by leaving a constitutionally significant risk of racial bias. In the other case, *California v. Brown*, 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987), the Supreme Court said the "Constitution ... requires that death penalty statutes be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion." In *Brown*, 479 U.S. at 540, 107 S.Ct. at 838, the Court held that, during the penalty phase of a capital murder trial, an instruction requiring that jurors " 'not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling' " did not violate the defendant's Eighth Amendment rights.

[¶ 50] Garcia ignores the clear holding of the United States Supreme Court in *Harmelin v. Michigan*, 501 U.S. at 994, 111 S.Ct. at 2701, that the standards he cites are limited to death penalty cases:

Proportionality review is one of several respects in which we have held that "death is different," and have imposed protections that the Constitution nowhere else provides. See, e.g., *Turner v. Murray*, 476 U.S. 28, 36–37 [106 S.Ct. 1683, 1688–89, 90 L.Ed.2d 27] (1986); *Eddings v. Oklahoma*, 455 U.S. 104 [102 S.Ct. 869, 71 L.Ed.2d 1] (1982); *id.*, at 117 [102 S.Ct. at 878] (O'CONNOR, J., concurring); *Beck v. Ala-*

*bama*, 447 U.S. 625 [100 S.Ct. 2382, 65 L.Ed.2d 392] (1980). We would leave it there, but will not extend it further.

[¶ 51] The sentencing factors for a North Dakota court to consider are listed in NDCC 12.1–32–04:

The following factors, or the converse thereof where appropriate, while not controlling the discretion of the court, shall be accorded weight in making determinations regarding the desirability of sentencing an offender to imprisonment:

1. The defendant's criminal conduct neither caused nor threatened serious harm to another person or his property.
2. The defendant did not plan or expect that his criminal conduct would cause or threaten serious harm to another person or his property.
3. The defendant acted under strong provocation.
4. There were substantial grounds which, though insufficient to establish a legal defense, tend to excuse or justify the defendant's conduct.
5. The victim of the defendant's conduct induced or facilitated its commission.
6. The defendant has made or will make restitution or reparation to the victim of his conduct for the damage or injury which was sustained.
7. The defendant has no history of prior delinquency or criminal activity, or has led a law-abiding life for a substantial period of time before the commission of the present offense.
8. The defendant's conduct was the result of circumstances unlikely to recur.
9. The character, history, and attitudes of the defendant indicate that he is unlikely to commit another crime.
10. The defendant is particularly likely to respond affirmatively to probationary treatment.
11. The imprisonment of the defendant would entail undue hardship to himself or his dependents.
12. The defendant is elderly or in poor health.
13. The defendant did not abuse a public position of responsibility or trust.
14. The defendant cooperated with law enforcement authorities by bringing other offenders to justice, or otherwise cooperated.

Nothing herein shall be deemed to require explicit reference to these factors in a presentence report or by the court at sentencing.

These designated factors allow the court to consider a variety of mitigating and aggravating circumstances in sentencing a convicted criminal.

[¶ 52] Although not essential to the sentencing process, the trial court clearly discussed the factors of the statute on the record:

*The defendant acted under strong provocation.* Best evidence at this point indicates that Mr. Garcia fired a shotgun at point-blank range at Mrs. Tendeland because she looked at him the wrong way. That is not provocation. In fact, it's the most senseless explanation for a murder I have ever heard of. That favors the State's position.

*There are substantial grounds present which tend to excuse or justify the defendant's conduct.* The only argument that seems to have been offered to excuse or explain this conduct has been youth and/or drug use. There is simply no basis for believing that the drug use on the night in question was the cause of the defendant's conduct. In fact, juveniles—the defendant's juvenile history would indicate that he has a serious history of serious assaults and that his problems are most likely the result of an unresolved anger problem, and that he possesses some sort of an explosive personality.

His record would indicate that he's the type of individual who is likely to blow at any point. There does not seem to be any justification for the conduct in this case. That favors the State's position.

*The victim induced or facilitated the commission of the offense.* Well, certainly nothing that the victims in this case did induced the commission of the offense. It is possible to argue in retrospect that,

perhaps, poor judgment was exercised by the occupants of the vehicle. Poor judgment does not equal a facilitation of the offense. And on this basis, I don't see where that favors anyone other than the State's position.

\* \* \* \* \*

*Eight, the defendant's conduct was the result of circumstances unlikely to recur.* The crime in this case remains unexplained to such a degree that the best evidence before the Court is simply that Mr. Garcia acted on an impulse, that that impulse was the result of being looked at the wrong way. This is certainly a set of circumstances that could recur at any point.

\* \* \* \* \*

*The defendant's unlikely to commit another crime.* The defendant's prior history indicates that he's a one-person judicial wrecking crew. He's committed any number of crimes. And I think that there's no reason to believe that he'll refrain from committing crimes in the future.

[Sentencing factors emphasized]. There is nothing inappropriate in the trial court's application of these factors, nor in its conclusion Garcia should be sentenced to life without parole.

▩ [¶ 53] A sentence within the minimum and maximum statutory limits is within the discretion of the trial court, and it will not be set aside unless it exceeds the statutory limit or unless the trial court substantially relied on an impermissible sentencing factor. *State v. Jacobson,* 419 N.W.2d 899, 903 (N.D. 1988). This sentence is within the statutory range, and Garcia has not shown the trial court substantially relied on an impermissible factor in sentencing him. *See State v. Manhattan,* 453 N.W.2d 758, 760 (N.D.1990). We conclude Garcia's sentence to life imprisonment without parole is not cruel and unusual punishment within the meaning of the Eighth Amendment.

## VI

▩ [¶ 54] Garcia argues his due process rights under the Fourteenth Amendment were violated, resulting in a sentence that is cruel and unusual within the meaning of the Eighth Amendment, because of a "complete absence before the sentencing judge of any information which might tend to mitigate" his sentence. We reject this argument.

[¶ 55] Garcia again relies on capital punishment cases holding that a sentencing body cannot refuse to consider nonstatutory mitigating circumstances. *See Mills v. Maryland,* 486 U.S. 367, 380, 108 S.Ct. 1860, 1868, 100 L.Ed.2d 384 (1988); *Sumner v. Shuman,* 483 U.S. 66, 76, 107 S.Ct. 2716, 2722, 97 L.Ed.2d 56 (1987); *Hitchcock v. Dugger,* 481 U.S. 393, 398–399, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347 (1987); *Gregg v. Georgia,* 428 U.S. 153, 193–195, 96 S.Ct. 2909, 2934–2935, 49 L.Ed.2d 859 (1976). Even though neither Garcia nor his lawyer offered any evidence of mitigating circumstances and the presentence investigation report mentioned none, Garcia argues the sentencing court has an "affirmative duty to inquire into mitigating factors which the presentence investigation report and defense counsel fail to articulate." This is not the law, even in capital punishment cases.

[¶ 56] The Supreme Court only speaks of the necessity of allowing a capital defendant to introduce, and for the sentencing authority to consider, any relevant mitigating evidence. *See, e.g., Brown,* 479 U.S. at 541, 107 S.Ct. at 839. Indeed, the Supreme Court in *Walton v. Arizona,* 497 U.S. 639, 649–650, 110 S.Ct. 3047, 3055, 111 L.Ed.2d 511 (1990), held that a state's capital sentencing scheme could impose on the defendant the burden of establishing, by a preponderance of the evidence, the existence of mitigating circumstances without violating the Eighth and Fourteenth Amendments.

[¶ 57] Most capital punishment jurisdictions do place on the defendant at least the burden of going forward with the existence of mitigating circumstances, if not the burden of proving them by the preponderance of the evidence. *See, e.g., Ivery v. State,* 686 So.2d 495, 503 (Ala.Ct.Crim.App.1996); *State v. Jackson,* 186 Ariz. 20, 918 P.2d 1038, 1047, *cert. denied,* —— U.S. ——, 117 S.Ct. 527, 136 L.Ed.2d 413 (1996); *State v. Breton,* 235 Conn. 206, 663 A.2d 1026, 1034 (1995); *State v. Moore,* 250 Neb. 805, 553 N.W.2d 120, 139

(1996); *State v. Harris,* 141 N.J. 525, 662 A.2d 333, 353 (1995); *State v. Soke,* 105 Ohio App.3d 226, 663 N.E.2d 986, 1006 (1995); *Lawton v. State,* 913 S.W.2d 542, 557 (Tex.Ct. Crim.App.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 88, 136 L.Ed.2d 44 (1996). The reason for placing the burden on the defendant is obvious. That person is the one who benefits from mitigating evidence and is in the best position to know of its existence.

[¶ 58] Here, Garcia was given an opportunity to offer evidence of mitigating circumstances during the presentence investigation and during the sentencing hearing. Garcia and his lawyer offered none.

[¶ 59] Before imposing sentence, the trial court asked Garcia and his lawyer if there was any legal reason why a sentence should not be imposed at that time. They did nothing. The trial court's frustration is portrayed by its comments before pronouncing Garcia's sentence:

> I came to this case with a personal philosophy.... My personal philosophy is that young people are never beyond redemption.

> My personal philosophy is that particularly young people are capable of changing, they are capable of reforming their lives, that they are capable of starting anew.

> I came to this case, looking for some reason, some justification, some excuse, to hand down a sentence less than the maximum. Mr. Garcia has given me no alternative, he has given me no opportunity.

The Eighth and Fourteenth Amendments placed no constitutional duty upon the trial court to affirmatively seek out mitigating circumstances before sentencing Garcia when Garcia himself did not offer any.

[¶ 60] We affirm the jury verdict, criminal judgment, and sentence.

[¶ 61] VANDE WALLE, C.J., and MARING, NEUMANN, and SANDSTROM, JJ., concur.