Filed 2/22/18 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2018 ND 43

State of North Dakota, Plaintiff and Appellee

v.

Kevin Frank Decker, Defendant and Appellant

No. 20170080

Appeal from the District Court of Morton County, South Central Judicial District, the Honorable Cynthia Feland, Judge.

AFFIRMED.

Opinion of the Court by Crothers, Justice.

Ladd R. Erickson, Special Assistant Attorney General, Washburn, ND, for plaintiff and appellee.

Kiara Costa Kraus-Parr, Grand Forks, ND, for defendant and appellant.

State v. Decker

No. 20170080

Crothers, Justice.

[¶1] Kevin Frank Decker appeals from a judgment entered after a jury found him guilty of disorderly conduct.  Decker argues the district court created a structural error by denying his Sixth Amendment right to a public trial when court staff excluded one member of the public from jury selection proceedings.  He also argues the State presented insufficient evidence for the jury to find him guilty of disorderly conduct.  We affirm the judgment, concluding the district court’s exclusion of one member of the public was too trivial to amount to structural error and the evidence was sufficient to sustain the conviction.

I

[¶2] Decker participated in protests against the Dakota Access Pipeline on August 11, 2016, at a construction site on North Dakota state highway 1806.  Police cordoned off the site with guarded police tape.  Decker stood at the front of the crowd, pressing into the police line.  Officer Gruebele stood immediately opposite Decker on the inside of the police line.  Gruebele testified that Decker lifted the police tape several times and was warned not to do so.  Decker began pushing against Gruebele, who then arrested Decker.  Decker testified that the crowd pushed him from behind into Gruebele.

[¶3] The State charged Decker with disorderly conduct under N.D.C.C. § 12.1-31-01.  At trial on January 31 and February 1, 2017, the district court directed deputies to prevent potential juror tainting after some potential jurors at a trial scheduled in December of 2016 received copies of a pamphlet on jury nullification and “voting your conscience.”  Decker joined an objection made by another defendant and asked for a mistrial based on denial of the right to a public trial:

“MR. REICHERT: . . . I brought up at one of the sidebars that the Court had closed the courtroom during voir dire.

THE COURT: You indicated that you wanted an opportunity to raise that issue, that hadn’t been something that was brought up to the Court previously.

MR. REICHERT: Correct.  Can I bring that up?

THE COURT: You can.

MR. REICHERT: Thank you.  I was made aware after jury selection that individuals of the public were not allowed in during jury selection.  I asked the Court at the sidebar if the Court had ordered that none of the public be allowed in during the—

THE COURT: No.  What you said was, I understand the Court ordered this.  And I will tell you now the Court issued no such order.  The Court did leave in the deputies’ sound discretion and did give direction because of what happened at the last attempted trial that we had in this matter that the jurors were to be—members of the public were to be restricted access to potential jurors in this case.  I left that up to law enforcement to decide how to accomplish that, but jurors and potential members of the public were not allowed to be seated together, so until that was ironed out, I indicated that I didn’t want that contact because I wanted no potential tainting of our jury panel.”

[¶4] Attorney Bruce Nestor, unconnected to the cases heard that day, testified deputies restricted his access to the courtroom during voir dire.  Another member of the public present in the courtroom during voir dire testified that some seats remained unoccupied.  Court staff testified they received orders to keep potential jurors separate from the public and that no seating was available for the public because of the large jury pool.  Court staff also indicated they did not advise members of the public they could enter the courtroom after the first jurors entered the jury box and seats in the courtroom became available.  The district court reviewed the U.S. Supreme Court case cited in oral argument, 
Presley v. Georgia
, 558 U.S. 209 (2010), and denied the motion for mistrial on the following day:

“THE COURT: . . . A couple of things I’m going to note for the record.  The deputy did testify yesterday that this Court did not specifically give him any specific direction.  I will note that this Court did make clear to court security, as well as the clerk’s office, that efforts were to be taken to prevent potential jurors from having contact with the public.  That was due to a situation that has never arisen before this Court before, and that is the efforts of the public on December 19th when this case was originally set to be tried, to tamper with potential jurors.  Provide them each a copy.  The court was contacted or notified by multiple people indicating that a flyer was being handed out to potential jurors and others in an effort to taint the jury. . . .

The Court never directed, as happened in the case [
Presley v. Georgia
] that you cited counsel, that this courtroom be closed to the public, but the Court did indicate that the public was not to have contact with potential jurors because of efforts of jury tampering that occurred with regard to these very same defendants when this Court was originally set to go to trial back on December 19th.

The Court would note that members of the press were here.  And contrary to Mr. Reichert’s assertions yesterday that they couldn’t do, and was sure they weren’t doing live streaming, I would point out to you, counsel, that proceedings held in chambers, proceedings that are closed to the public and jury selection may not be photographed, recorded or broadcast.  That is under Supreme Court Administrative Rule 214D and the Court had cited that in the original order that the Court issued in this case pertaining to a combined order on request of expanded media coverage and with regard to required conduct within the courtroom.  That was issued back on December 16th prior to the time that this case was originally set to be tried.  We had the public here, albeit there could have been more seats, the Court was not aware that people were being held outside of the courtroom, and if there were seats available where they wouldn’t be co-mingled with potential jurors in this case.

The Court would also note that Mr. Nodland was relieved of his duties as an attorney because his case was continued at his request prior to the jury selection process, and Mr. Nodland also remained in the courtroom.

So contrary to the case that you cite, the public was allowed to participate in this case.  The Court does view this as being different than the case that you cited in 
Presley v. Georgia
, and I am denying your request for a mistrial in this case.”

[¶5] The jury returned a guilty verdict to the disorderly conduct charge.  The district court sentenced Decker to one year of unsupervised probation with fines.

II

[¶6] Decker argues the district court created a structural error by denying one member of the public access to the courtroom during jury selection, thus violating Decker’s Sixth Amendment right to a public trial.  “We apply a de novo standard of review to a claim of a constitutional violation.”  
State v. Aguero
, 2010 ND 210, ¶ 16, 791 N.W.2d 1; 
see State v. Pe a Garcia
, 2012 ND 11, ¶ 6, 812 N.W.2d 328 (“A de novo standard of review applies to whether facts rise to the level of a constitutional violation. . . .”).

A

[¶7] Structural errors are violations of the framework of the trial rather than mere procedural errors.  
Arizona v. Fulminante
, 499 U.S. 279, 309-10 (1991).  “[S]ome constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error . . . .”  
Chapman v. California
, 386 U.S. 18, 23 (1967).

[¶8] Structural errors include deprivation of right to counsel, lack of judicial impartiality, racial exclusion from a grand jury, violation of the right to self-represent, and denial of the right to a public trial.  
Fulminante
, 499 U.S. at 309-10.  Structural errors are immune to the “invited error” doctrine and do not necessarily require action at the time the error occurs.  
See State v. White Bird
, 2015 ND 41, ¶ 24, 858 N.W.2d 642.  “Structural errors . . . are constitutional errors ‘so intrinsically harmful as to require automatic reversal’ regardless of whether they have been forfeited or waived.”
  State v. Watkins
, 2017 ND 165, ¶ 12, 898 N.W.2d 442 (quoting 
Neder v. United States
, 527 U.S. 1, 7 (1999)).  Structural error differs substantially from obvious error, for which a defendant bears the burden of showing either prejudice or an adverse effect on the outcome of the proceeding.  
See State v. Erickstad
, 2000 ND 202, ¶ 22, 620 N.W.2d 136 (finding no obvious error under N.D.R.Crim.P. 52(b) where defendants failed to show prejudicial effect of alleged error in jury instructions).

[¶9] The rights implicated in structural errors are not absolute.  
State v. Garcia
, 1997 ND 60, ¶ 20, 561 N.W.2d 599 (ruling right to a public trial “is not absolute and must give way in rare instances to other interests essential to the fair administration of justice.”).  The U.S. Supreme Court established when the right to a public trial gives way to other interests:

“The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.”

Press-Enterprise Co. v. Super. Ct. of Cal.
, 464 U.S. 501, 510 (1984) (finding the trial court erred in closing voir dire proceedings to the public even though neither party objected at the time).  Four factors must be present to avoid structural error in closing a courtroom:

“[1] [the claiming party] must advance an overriding interest that is likely to be prejudiced,[2] the closure must be no broader than necessary to protect that interest,[3] the trial court must consider reasonable alternatives to closing the proceeding, and[4] it must make findings adequate to support the closure.”

Waller v. Georgia
, 467 U.S. 39, 48 (1984) (numbering added) (citing 
Press-

Enterprise
, 464 U.S. 501 (1984)) (ruling a trial court’s “broad and general” findings did not justify closure of a seven-day suppression hearing and remanding for a new hearing).  North Dakota adopted the 
Waller
 standard for evaluating violations of the right to a public trial, strictly requiring the trial court to make findings before closure.  467 U.S. 39 (1984); 
State v. Klem
, 438 N.W.2d 798, 802 (N.D. 1989) (“An appellate court may not provide a post hoc rationale for why the trial court would have closed the trial had it held a hearing and made findings.”).  Voir dire falls within the scope of public trials under the Sixth Amendment.  
Presley v. Georgia
, 558 U.S. 209, 213 (2010) (citing 
Press-Enterprise
 and 
Waller
).

[¶10] Trial courts must “take every reasonable measure to accommodate public attendance at criminal trials.” 
Id.
 at 215.  Such measures can include reserving rows, dividing jury panels, and instructions to prospective jurors.  
Id.
  The overriding interests cited by the trial judge in closing voir dire to the public must be specific.  
Id. 
 Potential jurors always risk overhearing prejudicial remarks from public attendees, and a generic, broad rationale would permit courtroom closure nearly any time.  
Id.

[¶11] The U.S. Supreme Court recently concluded in 
Weaver
 that “an unlawful closure might take place and yet the trial still will be fundamentally fair from the defendant’s standpoint,” and “in the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to automatic reversal regardless of the error’s actual effect on the outcome.” 
Weaver v. Massachusetts
, 137 S.Ct. 1899, 1910 (2017) (citation omitted).  Thus, before ordering a courtroom closed to the public at any stage of a trial, a judge must make sufficient findings under the four 
Waller
 factors.  If a party objects to the closure and the judge has not made the required findings, on appeal the party generally receives a reversal.

[¶12] Here, the district court did not specifically order the closure.  This issue was raised after a person was denied access to the courtroom during jury selection.  Decker objected during trial.  The district court did not make any of the four 
Waller
 findings before the court was closed to the public.  On appeal Decker did not argue the district court’s direction to keep potential jurors separate from the public amounted to an understanding with court staff to evade the requirements of 
Waller
.  While we do not hold the district court intentionally closed voir dire proceedings to the public, the closure nevertheless raises Sixth Amendment concerns.  
See, e.g., Owens v. United States
, 483 F.3d 48, 63 (1st Cir. 2007) (finding cause for concern where judge’s inattention resulted in unauthorized closure of courtroom by court officer)
, abrogated by
 
Weaver v. Massachusetts
, 137 S.Ct. 1899 (2017); 
Walton v. Briley
, 361 F.3d 431, 433 (7th Cir. 2004) (“Whether the closure was intentional or inadvertent is constitutionally irrelevant.”).

B

[¶13] Our Sixth Amendment concerns may be allayed if closing voir dire had a trivial impact on Decker’s case.  Some courts have held certain errors are “not significant enough to rise to the level of a constitutional violation” under a triviality standard.  
Carson v. Fischer
, 421 F.3d 83, 94 (2d Cir. 2005).

“A triviality standard, properly understood, does not dismiss a defendant’s claim on the grounds that the defendant was guilty anyway or that he did not suffer ‘prejudice’ or ‘specific injury.’ It is, in other words, very different from a harmless error inquiry. It looks, rather, to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant—whether otherwise innocent or guilty—of the protections conferred by the Sixth Amendment.”

Peterson v. Williams
, 85 F.3d 39, 42 (2d Cir. 1996); 
see, e.g.,
 
United States v. Perry
, 479 F.3d 885, 890 (D.C. Cir. 2007) (ruling “an eight-year-old’s presence in the courtroom would neither ‘ensure that judge and prosecutor carry out their duties responsibly’ nor ‘discourage perjury’”); 
United States v. Ivester
, 316 F.3d 955, 958-

60 (9th Cir. 2003) (“Before applying the 
Waller
 test to determine whether the district court violated [defendant’s] Sixth Amendment right to a public trial, we must first determine whether the right attaches . . . .”); 
Braun v. Powell
, 227 F.3d 908, 918-19 (7th Cir. 2000) (concluding the permanent exclusion from trial of one person did not implicate defendant’s Sixth Amendment rights); 
United States v. Greene
, 431 Fed. App’x 191, 195-97 (3d Cir. 2011) (finding court staff’s temporary exclusion of defendant’s brother, where trial court did not subsequently ratify exclusion, trivial or “de minimis”).  In 
State v. Addai
, we upheld a district court’s decision to close the courtroom for a brief period of time on the mistaken belief a witness would testify about a restricted case where a transcript of the testimony was later made public.  2010 ND 29, ¶ 50, 778 N.W.2d 555.  Although our conclusion in 
Addai
 comports with the result under a triviality analysis, it appears our use of the plain error standard was incorrect.

[¶14] The Sixth Amendment right to a public trial advances four essential values:

“1) to ensure a fair trial;2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions;3) to encourage witnesses to come forward; and4) to discourage perjury.”

Peterson
, 85 F.3d 39, 43 (2d Cir. 1996).  Whether a courtroom closure made without proper 
Waller
 findings met the triviality standard, and hence was not a Sixth Amendment violation, depends on whether the closure implicated these four values.  
United States v. Aguiar
, 82 F. Supp. 3d 70, 84 (D.D.C. 2015).  We necessarily analyze these factors as a matter of law on the record and transcript.

[¶15] Here, Decker’s argument that the closure violated his Sixth Amendment rights fails under the triviality standard.  Members of the press and public were present during voir dire, advancing fairness of the trial, reminding the judge and prosecutor of their responsibility to the accused and importance of their functions, encouraging witnesses to come forward, and discouraging perjury.  The presence or absence of a singular member of the public, a lawyer unconnected to proceedings that day, did not affect the four values advanced by the right to a public trial.  Conflicting testimony on when seats opened during voir dire does not require a different result.  Any potential inconsistency or impairment of the right to a public trial was mitigated by the presence of press and public during jury selection.  We conclude the alleged structural error arising from courtroom closure during trial meets the triviality standard and did not violate Decker’s Sixth Amendment rights.

III

[¶16] Decker argues the evidence presented at trial was insufficient to convict him of disorderly conduct.

“In an appeal challenging the sufficiency of the evidence, we look only to the evidence and reasonable inferences most favorable to the verdict to ascertain if there is substantial evidence to warrant the conviction.  A conviction rests upon insufficient evidence only when, after reviewing the evidence in the light most favorable to the prosecution and giving the prosecution the benefit of all inferences reasonably to be drawn in its favor, no rational fact finder could find the defendant guilty beyond a reasonable doubt.  In considering a sufficiency of the evidence claim, we do not weigh conflicting evidence, or judge the credibility of witnesses.  A verdict based on circumstantial evidence carries the same presumption of correctness as other verdicts.”

State v. Noorlun
, 2005 ND 189, ¶ 20, 705 N.W.2d 819 (citations omitted).  Section 12.1-31-01, N.D.C.C. provides, in relevant part: 

“1. An individual is guilty of a class B misdemeanor if, with intent to harass, annoy, or alarm another person or in reckless disregard of the fact that another person is harassed, annoyed, or alarmed by the individual’s behavior, the individual:

a. Engages in fighting, or in violent, tumultuous, or threatening behavior;

. . .

d. Obstructs vehicular or pedestrian traffic or the use of a public facility;

. . .

g. Creates a hazardous, physically offensive, or seriously alarming condition by any act that serves no legitimate purpose;”

[¶17] Decker claims that he lacked the requisite intent for the crime, that he had a legitimate purpose in protesting at the site, and that no testimony established Decker intended to adversely affect the safety, security, and privacy of another person.  These arguments merely request us to reweigh the evidence.  The jury heard testimony from Officer Gruebele and found his account more credible.  Yelling at an officer, refusing multiple officer requests, and scuffling with officers each have been found independently sufficient for disorderly conduct convictions.  
See State v. Bornhoeft
̧ 2009 ND 138, ¶ 12, 770 N.W.2d 270 (affirming disorderly conduct conviction for man yelling on the street at 1:15 a.m.);
 State v. Barth
, 2005 ND 134, ¶22, 702 N.W.2d 1 (affirming disorderly conduct conviction for man who gave officers the middle finger and “grazed” an officer with his fist); 
State v. Saavedra
, 396 N.W.2d 304, 305 (N.D. 1986) (affirming disorderly conduct conviction for man who left patrol car and scuffled with officers).  Decker’s argument of insufficient evidence fails, and his conviction here aligns with past cases in this Court.

IV

[¶18] We affirm the judgment, concluding the district court’s exclusion of one member of the public was too trivial to amount to structural error and the evidence was sufficient to sustain the conviction.

[¶19] Daniel J. Crothers

Lisa Fair McEvers

Gerald W. VandeWalle, C.J.

Tufte, Justice, dissenting.

[¶20] I respectfully dissent.  The Majority frames the issue as turning on the exclusion of a single member of the public and sees conflict in the testimony below.  The Majority determines that the courtroom closure raises Sixth Amendment concerns but was too trivial to implicate Decker’s public trial right.  I frame the issue differently, see no material conflict in the testimony below, and conclude there was a non-trivial violation of Decker’s public trial right requiring a new trial.

A

[¶21] The issue before us is whether the exclusion of the public from the courtroom during jury selection was significant enough to violate Decker’s Sixth Amendment right to a public trial.  The Majority frames the issue too narrowly, apparently inferring that because only one person testified to having been personally excluded, he was the only member of the public who was denied access to the courtroom during jury selection.  I see no conflict in the testimony as to the crucial issues:  who was excluded (everyone), how long they were excluded (during all of jury selection), and what accommodations the district court made to permit the public access to the jury selection portion of the trial (none).  Because I do not see the conflict the Majority sees in the record, I quote extensively to show the consistent testimony on these issues.

[¶22] The district court heard testimony related to the closure from Deputy Tom Schroeder, Chad Nodland, Bruce Nestor, and Bailiff Laurence McMerty.  The district court also relied on its own observations of the courtroom and heard argument from State’s Attorney Ladd Erickson and defense counsel for Decker and his co-

defendants.

[¶23] Deputy Schroeder was in the hallway outside the courtroom.  He testified that he was told not to allow anybody into the courtroom during jury selection and that he followed those orders.  He also testified to his limited view of the courtroom and from that limited view could only confirm that he had seen a security chair unoccupied:

Q. Did you not allow people into the courtroom during voir dire?A. We were advised to not allow anybody in while the jury selection was occurring.

. . . .

Q. And you followed out those orders?A. Yes, sir.Q. And did you tell people they couldn’t come in during jury selection?A. Yes, sir.

. . . .

Q. Did you look in here during the voir dire?A. Yes.Q. Could you see that there were seats available in here?A. I couldn’t see the corners.  We could just see—the windows are pretty small and pretty narrow so we only had a third of the view coming in.Q. Could you see where there was seats available?A. The one time I looked in all I seen was the security chair.

[¶24] Chad Nodland is an attorney who represented one of the other defendants who had been scheduled for joint trial with Decker.  Mr. Nodland appeared for his client at the opening of trial and requested a continuance, which the court granted.  He remained in the courtroom as the trial proceeded.  He testified as follows:

Q. Mr. Nodland, were you in the courtroom during the voir dire of this case?A. Yes, I was.Q. Could you see, was there room for anyone to sit in the gallery of the courtroom?A. Absolutely.Q. Was there more than one seat?A. Yes.Q. Was there more than two?A. Yes.Q. Do you have an estimate as to how many there were?A. I would say six or seven as a guess.

[¶25] Bruce Nestor is an attorney who was not representing anyone involved in the trial.  In the Majority’s framing, at ¶ 15, he is the “singular member of the public” who was denied entry to the trial.  He testified as follows:

Q. Did you try to get into the courtroom during voir dire?A. I did.  Initially I asked downstairs security when I entered the building if I could—I was told by a tall red-haired deputy that I could not be in the courtroom during voir dire.  I then approached the double swinging doors outside of courtroom 305, I had some conversation with the deputies there that I wasn’t allowed in during voir dire.  At one point the doors opened and I believe I spoke to the bailiff in a yellow shirt here, he asked if I was a lawyer, I said, I am a lawyer but not on the case, and he said I would not be allowed in during voir dire.

[¶26] Finally, Bailiff Laurence McMerty testified that the courtroom was closed to the public from the beginning because the court had called a large number of potential jurors.  Mr. McMerty stated that the courtroom was completely full of potential jurors when jury selection began.  After the first twenty people were called up into the jury box for questioning, Mr. McMerty indicated that “about ten” seats were open in the public gallery part of the courtroom but that he did not go into the hall to tell any of the people waiting there that they could come in.

Q. Can you tell the Court what your concerns were?A. My concern was about seating in the courtroom when we were doing jury selection.  At the beginning of the day we had no idea how many jurors were going to be present in the courtroom.  We had been told that an extra number of jurors had been called to be selected or to be available for selection to the jury, but we did not know the exact number.  So 
we intentionally did not allow members of the public into the room so that we would have enough seats for the jury
.  As it turned out we had to bring all of the chairs in from the jury room to provide seating for the jurors, plus we had to go into the Judge’s chambers to find additional chairs to bring into the room to provide seating for the jurors.  
So prior to assigning numbers to the jury, this room was packed with potential jurors, there was no room for members of the public to sit in the courtroom
.Q. Were there other people in here that weren’t part of the jury pool sitting back there?A. Yes.  We were told to allow members of the press into the Court.Q. Did you do that?A. We did.Q. How many members of the press were here?A. Five.Q. Did they have cameras and print media?A. We had both camera and print media, yes, sir.Q. Any other members of the public or non-jurors, non-defendants, sitting in court during the jury selection?A. Not to my recollection.  I am talking about when the jurors were brought in initially, not to my recollection.Q. Do you remember if Mr. Nodland was in here?A. Mr. Nodland was in here after the jurors had been assigned their numbers and 20 of the jurors had been brought up to the front of the courtroom.  They were seated here, and then there were six in front here, Your Honor.

. . . .

Q. 
And was it your testimony that the public was barred from this from the beginning?
A. Oh, no, sir. . . . I knew there was another attorney who had come in earlier in the day who wanted to come in and I knew he was sitting on the bench out there, but I didn’t know if I had the authority or the right to go out and tell him that he could come in because this procedure was going on and we didn’t want to distract from that.  But no one told me not to let the public in or anything like that.

. . . .

Q. Excuse me if I misheard you before, but 
wasn’t it your testimony that you didn’t know how many jurors were going to be here so that the room was closed right away to the public?
A. 
That’s correct.

. . . .

Q. 
So when jury selection started, there were 20 empty seats?
A. 
There were 20 empty seats in the courtroom, yes, sir.

. . . .

Q. 
So how many seats were available then on the backside of the bar?
A. 
At that point about ten.

(Emphasis added.)

[¶27] Mr. Erickson argued that there was no good way to determine which members of the public should be allowed in if there were more wanting access than there was room in the courtroom.  He stated “there was no room in here for anybody but those jurors originally.”  He then conceded “
the hallway was full of people 
out there and, yeah, 
they could have got some more in here potentially, but not everybody
.”  Agreeing that “maybe some” of the people in the hall could have entered during jury selection, the State’s argument turned on the difficulty in deciding which members of the public would be permitted entry.  Reflecting his observation of the audience as the trial went on, he stated that after the jury was selected and the excess potential jurors excused, “the benches were completely full.”

MR. ERICKSON:  I just want to put on the record there was no room in here for anybody but those jurors originally.  It was packed.  I mean, this courtroom isn’t big enough for more than that jury panel.

. . . .

You know, there was more people—the reason that I say that—I don’t know who you would deny.  I mean, 
the hallway was full of people 
out there and, yeah, 
they could have got some more in here potentially, but not everybody
.  I don’t know where the line is when you draw that.  This afternoon, after the jury panel was excused, the benches were completely full.  They wouldn’t have been able to get in here when we were doing jury selection, maybe some of them would have, I’m not arguing that, but at some point, you’ve got a capacity of 85, you can’t.  Does that mean you can’t try the case, right?

[¶28] Both Deputy Schroeder and Bailiff McMerty testified that no one was allowed into the courtroom during jury selection in order to allow room for all potential jurors.  Only Mr. Nestor testified that he was personally excluded.  Mr. Nodland was present in the courtroom during jury selection.  When Nodland entered the courtroom, he entered as an attorney with business before the court, not as a member of the public.  After his case was continued, he stayed in the courtroom.  The State’s argument conceded that the “hallway was full of people” and that after jury selection was completed, the courtroom again filled up with interested members of the public.  The testimony differed as to the precise number of open seats, but those who were in the courtroom to see all agreed there were some seats available.  The court could observe this for itself and didn’t disagree with the testimony or the lawyers’ characterization of space available.

[¶29] The district court did not specifically order the courtroom closed for jury selection.  The court explained that “it did give direction” to the deputies to the effect that “members of the public were to be restricted access to potential jurors in this case.”  The court then “left that up to law enforcement to decide how to accomplish that.”  No transcript is available for the jury selection proceedings held while the public was excluded.  
See State v. Entzi
, 2000 ND 148, ¶ 6, 615 N.W.2d 145 (stating jury selection may be conducted off the record if there is no request for recording or objection to lack of recording).

B

[¶30] We have recognized that violation of the right to a public trial is a structural error “so intrinsically harmful as to require automatic reversal.”  
State v. Watkins
, 2017 ND 165, ¶ 12, 898 N.W.2d 442 (citing 
Neder v. United States
, 527 U.S. 1, 7 (1999), and 
State v. White Bird
, 2015 ND 41, ¶ 24, 858 N.W.2d 642).  The strict rule announced in 
Presley v. Georgia
, 558 U.S. 209, 214-15 (2010), that “trial courts are required to consider alternatives to closure” and “take every reasonable measure to accommodate public attendance at criminal trials,” applies directly here.  None of our cases or those of the U.S. Supreme Court recognize the “triviality standard” adopted by the Majority.  Derived from two Second Circuit decisions, the standard distinguishes a courtroom closure “too trivial to amount to a violation” from the harmless error inquiry that looks to whether a defendant suffered prejudice.  
Peterson v. Williams
, 85 F.3d 39, 43 (2d Cir. 1996); 
see also Carson v. Fischer
, 421 F.3d 83, 94 (2d Cir. 2005).  The other four cases cited by the majority all rely on 
Peterson 
or 
Carson
.

[¶31] The Majority quotes the Supreme Court’s recent decision in 
Weaver v. Massachusetts
, 137 S. Ct. 1899 (2017), for the proposition that despite an unlawful closure, a trial may still be fundamentally fair from the defendant’s standpoint.  The Supreme Court was not saying that a trivial violation might still leave the defendant with a fair trial.  It bears emphasis that Decker, like Presley, was on direct appeal, where “a new trial generally will be granted as a matter of right.”  
Id.
 at 1913.  In contrast, Weaver was claiming ineffective assistance of counsel in post-conviction relief proceedings where he “must show prejudice in order to obtain a new trial.”  
Id.

[¶32] Here the closure was not the result of a pretrial motion or other intentional decision by the court.  It apparently resulted from inadequate communication between the court and the bailiffs and deputies assigned to the trial.  The court had no advance opportunity to weigh the 
Waller 
factors and consider whether their consideration would support the closure that occurred.  Although the court suggested it may have specifically ordered the same closure to avoid commingling of the public and jury panel, it did not make the sort of post-hoc 
Waller 
analysis we considered and rejected in 
Klem
.  
See State v. Klem
, 438 N.W.2d 798, 802 (N.D. 1989).  The court simply considered whether the public was fully excluded and concluded that the presence of Mr. Nodland and five members of the press was adequate public access.

[¶33] We long ago rejected the State’s argument to the district court that the choice is between every member of the public gaining entry or the trial not being held.  
State v. Nyhus
, 19 N.D. 326, 331, 124 N.W. 71, 72 (1909) (rejecting notion that “the state is burdened by these provisions with the duty of providing courtrooms of sufficient capacity to accommodate every one who may wish to be present at trials”).  The interests of the public trial demand at least that “without partiality or favoritism, a reasonable portion of the public is suffered to attend.”  
Id.
 at 331-32, 124 N.W. at 73 (citing Thomas M. Cooley, 
Treatise on the Constitutional Limitations
 373 (6th ed. 1890)); 
see also Presley v. Georgia
, 558 U.S. 209, 215 (2010) (suggesting accommodations to include reserving one or more rows, dividing the prospective jurors into groups, and giving instructions to prospective jurors to avoid contact with the public).

[¶34] The district court’s error here began with its failure to reserve some seating for the interested public to use on a first-come, first-served or other fair basis once it knew of the large number of potential jurors to be called and great public interest in the trial.  The court knew well before trial that 41 jurors had been called to seat a six-person jury.  It was no surprise to the court that there was broad public interest in observing this particular trial.  The same reasons that led the court to call so many extra jurors should have prompted it to consider accommodations for some members of the public to attend.  The court does not have to accommodate every person who wants to attend a trial.  It does not have to relocate a trial to a sports stadium.  It ought to consider use of the largest available courtroom.  It must consider options for reserving some seating in the courtroom for interested members of the public, even if that means potential jurors are divided into separate groups.  
Compare People v. Floyd
, 988 N.E.2d 505, 506-07 (N.Y. 2013) (“Mere courtroom overcrowding is not an overriding interest justifying courtroom closure.”) 
with People v. Rush
, 51 N.Y.S.3d 290, 293 (N.Y. App. Div. 2017) (holding brief exclusion of public from crowded courtroom was not a public trial violation where officer cleared back row of courtroom once first group of jurors had been seated in jury box and attempted to locate those who had been excluded).

[¶35] We may leave for another day the question of whether some closures are too insignificant to violate the public trial right.  I would not conclude that every courtroom closure no matter how brief or limited is a structural error requiring a new trial.  For example, a trial judge may certainly exclude particular individuals who are disruptive and may order that doors stay closed to limit noise and allow entry only during recesses.  Whether called “trivial” or not, such partial or temporary restrictions on public access are not properly considered the sort of “closure” within the meaning of the Sixth Amendment or N.D. Const. art. I, § 12.

C

[¶36] The Majority, at ¶ 13, relies on a “triviality standard” articulated by two Second Circuit cases and followed by several other federal courts.  Those cases are undermined by a more recent decision from the same court that emphasizes the narrow application of its “triviality standard.”  
U.S. v. Gupta
, 699 F.3d 682, 688 (2d Cir. 2012).  After its decisions in 
Peterson 
and 
Carson
, and after all the cases cited by the Majority, the Second Circuit explained that “[w]hatever the outer boundaries of our ‘triviality standard’ may be . . . a trial court’s intentional, unjustified closure of a courtroom during the entirety of 
voir dire
 cannot be deemed ‘trivial.’”  
Id.
 at 689.

[¶37] In 
Gupta
, a courtroom deputy instructed the defendant’s brother and the brother’s girlfriend to leave the courtroom before the start of jury selection.  
Id.
 at 686.  The public was excluded during jury selection at the court’s direction because of the large number of people called for jury duty and to protect them “from hearing anything about the case from any member of the public present.”  
Id.
 at 687.  The government did not dispute that those reasons were inadequate.  
Id.
 at 687-88.  Rejecting application of the “triviality standard” set forth in 
Carson 
and 
Peterson
, the Second Circuit explained that the proceedings closed to the public need not be contentious:  “it is the openness of the proceeding itself, regardless of what actually transpires, that imparts ‘the appearance of fairness so essential to public confidence in the system’ as a whole.”  
Id. 
at 689 (quoting 
Press-Enterprise Co. v. Super. Ct. of Cal.
, 464 U.S. 501, 508 (1984)).  “[E]xcluding the public for all of 
voir dire
 without justification grounded in the record . . . is not trivial.”  
Id.
 (citations omitted).

[¶38] Here, the record shows that no member of the public was admitted.  Attorney Nodland was allowed in as an attorney, and when his case was continued, he remained in the courtroom, becoming a member of the public only after he was inside.  No transcript of jury selection is in the record.  In finding unjustified closures “trivial,” both 
Peterson
 and 
Carson
 relied on the availability of the record and a later summary in open court of testimony given during the courtroom closure.  
Id.
 at 689 n.1.  Our decision in 
Addai
 similarly emphasized the “brief period of time” the courtroom was closed and the public availability of a transcript of proceedings during the closure.  
State v. Addai
, 2010 ND 29, ¶ 50, 778 N.W.2d 555.

[¶39] Media access is no substitute for public attendance.  
Klem
, 438 N.W.2d at 801 (stating “[w]hile the trial court’s allowance of the presence of a media representative may have satisfied the public’s first amendment right, it did not address the defendant’s sixth amendment right to a public trial”).  Although members of the press were present, the court apparently agreed that “people were being held outside of the courtroom” during jury selection.  The court simply didn’t know it at the time.  The court also acknowledged “there could have been more seats” but didn’t clearly make a finding as to how many seats were available at the start of jury selection.  The court’s consistent concern was that if seats were available, they would be co-mingled with potential jurors.  Whether or not there were seats available in the public gallery during jury selection is ultimately not determinative.  If there were seats, the public trial right was violated by barring at least one person (and apparently a hallway full of other people) from access to those available seats.  If there were no seats available, the public trial right was violated by the court’s failure both to consider reasonable alternatives to closure and to weigh the need for closure and the scope of closure against the reasons supporting closure.

D

[¶40] I would conclude that Decker established a violation of his right to a public trial because every member of the public was barred entry to the courtroom throughout jury selection.  The presence of some members of the press and one token member of the public, who was allowed entry only because at the time he entered he had business before the court, does not render the error harmless or trivial.  The district court may not exclude the public solely because the courtroom will be filled by an unusually large pool of potential jurors.  Those are precisely the cases where the court has reason to expect greater public interest in observing the trial.  There is little reason to think the district court’s error affected the result, but our cases tell us that a structural error such as this automatically results in a new trial precisely because the effect is difficult to measure.  I would reverse the conviction and remand for a new trial.

[¶41] Jerod E. Tufte

Jon J. Jensen